### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN FIENE and ERIK KISER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2021-cv- 5740 |
| | ) | |
| MATTHEW SCHWEINZGER, | ) | |
| | ) | |
| Defendant. | ) | JURY DEMANDED |
| | ) | |

## COMPLAINT

Plaintiffs, CHRISTIAN FIENE and ERIK KISER, by and through their undersigned attorneys, LOFTUS & EISENBERG, LTD. and for their Complaint against Defendant, MATTHEW SCHWEINZGER, ("Defendant"), states as follows:

### I.    INTRODUCTION

1.    JJMT Capital, LLC ("JJMT") served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. JJMT's members Joseph DeAlteris ("DeAlteris"), Matthew Schweinzger ("Schweinzger"), Jacob Wunderlin ("Wunderlin"), and Tyler Crookston ("Crookston") were fiduciaries for investors who invested in 1inMM.

2.    JJMT organized its operations with each of the four principals soliciting and managing their own investors. Investors with prior relationships with Schweinzger dealt only with Schweinzger and he personally communicated with each of his investors via email. Upon information and belief, the JJMT members allocated the profits amongst themselves based on the same assignments of certain investors to certain members.

3.    Horwitz's scheme was absurd, and it wouldn't have been funded but for sophisticated placement agents – including Defendant – parroting his lies, cloaking the scheme in

their own credibility as brokers and investment bankers for large Wall Street firms, and selling the offering to their closest friends.

4.      Defendant acted as a broker for investment in 1inMM and owed well defined duties in that role to do some investigation into the investment before offering it. Instead, Defendant operated in willful ignorance and never sought any third-party confirmation of Horwitz's stories.

5.      Defendant, as a broker, was the gatekeeper of any information.

6.      Had Schweinzger done any of the same due diligence he did at his "day job" as Chief Acquisition Officer of Acrisure, LLC for his own company, such as calling HBO or Netflix, obtaining 1inMM bank records, or ordering an audit, as required by controlling regulations, before recommending this investment, all of this would have been prevented and Plaintiffs would not have even been presented with this "opportunity."

## II.     **PARTIES**

7.      Plaintiff, Christian Fiene, is and at all times relevant to this action, has been a citizen of the state of California and domiciled in California.

8.      Plaintiff, Erik Kiser, is and at all times relevant to this action, has been a citizen of the state of California and domiciled in California.

9.      Defendant, Matthew Schweinzger ("Schweinzger"), is and at all times relevant to this action, has been a citizen of the state of Illinois and domiciled in Illinois.

10.     Schweinzger was all times relevant hereto a member and control person of JJMT Capital, LLC ("JJMT").

11.     Schweinzger personally introduced Plaintiffs to the investment and handled all of their investments with 1inMM.

### III.     JURISDICTION AND VENUE

12.     This court has diversity jurisdiction with respect to Plaintiffs' claims against Schweinzger pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2).

14.     Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over Defendant because Defendant committed the tortious acts complained of in Cook County, Illinois.

15.     The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not removable to federal court under the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 77p(f)(3), nor is it subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

### IV.     FACTS COMMON TO ALL COUNTS

#### A.  Horwitz's Obvious Ponzi Scheme

16.     Zachary Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted a Ponzi scheme raising over $690 million from investors through several de facto placement agents including JJMT using fabricated agreements and fake emails with prominent third-party companies with whom Horwitz had no actual business relationship.

17.     Horwitz told Defendant directly and through his JJMT partners that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in

specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

18.     Horwitz told Defendant he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

19.     In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

20.     On September 1, 2021, Horwitz pled guilty to securities fraud.

21.     Horwitz obtained funds from JJMT and other firms acting as placement agents via promissory notes which were funded by notes issued to individual investors.

22.     Horwitz relied on Defendant and his network of wealthy friends to act as his brokers or investment bankers to raise funds and serve as a gatekeeper of his lies delivered to retail investors.

23.     The promissory notes issued by 1inMM to the de facto placement agents including JJMT had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

24.     Horwitz told Defendant that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

25.     Horwitz told Defendant he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and

Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

26.     Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

27.     The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

28.     Any of these supposed revenue streams could have been confirmed by contacting reputable third parties directly but never were.

29.     Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

30.     To support his false representations, Horwitz sent forged documents to JJMT that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

31.     Horwitz's representations were false and the documents he sent to JJMT were fabricated.

32.     These falsehoods could have easily been confirmed prior to any investment by Plaintiffs with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and JJMT had reaped millions in "commissions."

33.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the promissory notes and did not sell those rights to Netflix or HBO.

34.     Horwitz used money "invested" in his "company" for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

35.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

36.     Horwitz provided JJMT false explanations by text message and email for why he had stopped making payments.

37.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

38.     Horwitz told JJMT that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM

39.     Throughout 2020, Horwitz lulled JJMT, with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

### B. JJMT's Ignorant Participation in the Scheme

40.     Horwitz raised money with five principal firms who acted as placement agents selling notes for investment, including JJMT, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

41.     Schweinzger raised money primarily from his wealthy Indiana University classmates and employees of Acrisure where he was CFO.

42.     Schweinzger relied on personal relationships and word-of-mouth referrals to obtain investors who would trust him based on their relationship or his role as CFO of their employer.

43.     JJMT typically solicited investors in person, over the telephone, and via email for the 1inMM Offering.

44.     JJMT solicited nearly $500,000,000 in investment via promissory notes in the 1inMM Offering of which $120,000,000 remains outstanding.

45.     In or about March of 2014, Horwitz first presented his Indiana University buddy Wunderlin, with an investment opportunity in 1inMM, whereby Wunderlin would lend funds in exchange for a promissory note, and the funds would serve to finance and facilitate the licensing of specific media content to a streaming platform.

46.     Horwitz made representations regarding 1inMM to Wunderlin regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

47.     Schweinzger negligently relied only on representations from Horwitz and those parroted by his JJMT partners when recommending the investment to Plaintiffs rather than confirming anything with third parties.

48.     In or about July of 2015, JJMT was created by DeAlteris, Schweinzger, Wunderlin, and Crookston for the sole purpose of selling investment into 1inMM.

49.     In or about November of 2015, the JJMT members began to utilize JJMT as the placement agent for 1inMM. The capital deployed by JJMT was provided by Plaintiffs.

50.     During this time, Horwitz made representations and provided purported contracts, emails, and other information to the JJMT members, which JJMT negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

51.     The timeline of funding described by Schweinzger in his initial emails to Plaintiffs screamed Ponzi Scheme but Plaintiffs trusted their sophisticated friend who had direct contract with Horwitz to perform the required due diligence.

52.     Defendant proceeded to sell Plaintiffs promissory notes for the 1inMM Offering by regurgitating the lies told by Horwitz.

53.     Schweinzger acted as the gatekeeper of information from Horwitz and as fiduciaries to Plaintiff.

54.     In a December 16, 2019 email, Wunderlin told investors that he had never even seen bank statements or any indication of payment actually received by Netflix or HBO, stating:

> We are trying to use this opportunity [the defaults] to dig in with further diligence and pry open some of the sensitive information 1inMM has historically held close. For example, bank statements... letting JJMT create a model going forward for cash flow management... with the ultimate goal of becoming a partner in a CFO type role where 1inMM is an open book (long way to go to get there... but trying to leverage 1inMM's misstep into something positive)

55.     Rather than relying on any substantive investigation of its own, Schweinzger relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate or likely just a profitable Ponzi Scheme.

56.     Defendant did not bother to do his own independent due diligence when promoting the Ponzi Scheme as a suitable investment to Plaintiffs.

57.     Horwitz peppered Defendant with hundreds of bogus documents supporting his scheme.

58.     Defendant relied exclusively on Horwitz's own due diligence of himself and 1inMM rather than doing his own investigation.

59.     Defendant kept his head in the sand so long as the lulling payments kept coming in from 1inMM.

60.     From in or about mid 2015 until late 2019, JJMT's financing of 1inMM's content licensing transactions continued to grow. During this time, JJMT provided financing to 1inMM in exchange for promissory notes with total principal value of approximately $485 million.

61.     The amount repaid by 1inMM to JJMT during this period for these promissory notes, inclusive of specified interest, was approximately $440 million, some of which was redeployed by noteholders for future loans.

**C. Schweinzger's Duty to Plaintiffs**

62.     The 1inMM Offerings were structured as follows: JJMT lent money to 1inMM for defined projects, JJMT funded the loan to 1inMM via a promissory note from Plaintiff, JJMT charged 1inMM 35% interest on the notes and paid investors 20% interest on the notes, leaving a 15% "commission" for JJMT for placing the investment.

63.     For all intents and purposes, JJMT was acting as a placement agent for 1inMM and was paid a 15% commission on the sales.

64.     Defendant owed Plaintiffs fiduciary duties as an investment advisor.

65.     Placement agents such as Schweinzger who sell private placements to retail customers for a commission, as Schweinzger did here, are required to register with the Financial Industry Regulatory Authority ("FINRA").

66. FINRA regulates broker/dealer firms like JJMT and Schweinzger and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to. Schweinzger was formerly a registered broker prior to forming JJMT.

67. Plaintiffs reasonably relied on the representations made by Schweinzger because he was the Chief Financial Officer ("CFO") and Chief Acquisition Officer of Acrisure, LLC, an insurance brokerage earning over $1 Billion dollars in annual revenue, and employer of countless JJMT investors who trusted their company's CFO to properly investigate an investment before offering it.

68. Plaintiffs justifiably relied on Schweinzger's stellar credentials. If he could competently evaluate acquisitions of a billion-dollar insurance brokerage he certainly could evaluate Horwitz's operation.

69. Schweinzger's whole job at Acrisure was doing due diligence on targets of acquisition and investment. Plaintiffs reasonably assumed Schweinzger would exercise the same level of care for JJMT as Acrisure when evaluating 1inMM.

70. While JJMT was not a licensed broker-dealer, it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission.

71. As a placement agent, or at least a party acting in that role, Schweinzger was required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

72. SEC Regulation Best Interest ("Reg BI") provides that Schweinzger, as a placement agent, owed the following duties to Plaintiffs:

(ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:

(A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;

(B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;

(C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(1).)

73.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a.      the issuer and its management;

b.      the business prospects of the issuer;

c.      the assets held by or to be acquired by the issuer;

d.      the claims being made; and

e.      the intended use of proceeds of the offering.

74.     Schweinzger had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

75.     FINRA has also provided detailed guidance on how a broker-dealer such as JJMT Schweinzger was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

76.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM and its history by Schweinzger would have included:

a.     Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.     Looking for any trends indicated by 1inMM's financial statements;

c.     Contacting customers and suppliers regarding their dealings with 1inMM;

d.     Reviewing 1inMM's contracts, leases, and financing arrangements;

e.     Inquiring about 1inMM's past securities offerings and the degree of their success;

f.     Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

77.     This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer himself. There was zero independent investigation done by Schweinzger or his compatriots at JJMT.

78.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's business prospects by JJMT should include:

a.     Inquiring about the viability and value of any movies funded by 1inMM;

b.     Inquiring about the industry in which 1inMM operates, and the competitive position of 1inMM; and

c.     Requesting any business plan, business model or other description of the business intentions of 1inMM and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative

12

assets to validate projected returns, break-even points, and similar information provided to investors.

79.     This was not done here. The contracts were fictitious. Neither Schweinzger nor his colleagues at JJMT engaged HBO or Netflix independent of Horwitz.

80.     Minimal investigation would have confirmed the purported counsel at Netflix was not even working at Netflix at the time of the supposed emails or that HBO had no record of 1inMM.

81.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's assets and facilities should include:

a.      Carefully examining any reports by third-party experts that may raise red flags;

b.      Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

c.      Inquiring about previous or potential regulatory or disciplinary problems of the issuer.

d.      Obtaining a credit check of 1inMM.

e.      Making reasonable inquiries concerning the issuer's management. Schweinzger should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change.

f.      Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might

make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g. Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

82. Schweinzger failed to do this third-party confirmation of this supposedly $600,000,000 operation.

83. A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

84. FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

85. Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

86. Schweinzger could not rely blindly upon the issuer for information concerning a company, nor may he rely on the information provided by the issuer in lieu of conducting his own reasonable investigation.

87. While broker-dealers like JJMT are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and

independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

88.     Of course, under these circumstances, Defendant was in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since he was acting as its placement agent or investment banker raising capital exclusively for 1inMM.

89.     As the de facto placement agent and investment banker for 1inMM, JJMT was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

90.     In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

91.     As described below, unfortunately for Plaintiff, Schweinzger failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that he owed Plaintiff.

**D.  1inMM Defaults**

92.     Between 2015 and 2019, JJMT never missed a payment to investors and lowered the rates of return on notes from 35% to 25%.

93.     In January 2018, Crookston emailed one investor, noting his title of Chartered Financial Analyst:

I wanted to shoot you a note to let you know that going forward I will be taking a reduced role within JJMT Capital and that Jake Wunderlin will be your point person for reinvestment, repayment, upcoming deal flow, etc.

In no way does this change your current investment risk or payback period but I just wanted to alert you that I will be slowly reducing my role as a partner within the firm.  I will still be on most communication, will still be available for any questions and will still be involved but it will be in a heavily reduced role going forward.

I am still personally heavily invested with JJMT thru December 2018 and will be on the look out for your best interests/monitor our fiduciary responsibilities but myself and the other partners felt it was best to slowly wind down my involvement.

I wanted to let you know as soon as possible of this new development – as I said it shouldn't substantially change your investment risks, etc  - but if you want to talk further about why I am leaving JJMT I can make myself available for a phone call at anytime or would love to catch up over a drink.

Thanks,
Tyler

--

__
**Tyler Crookston, CFA**

94.     In December 2018, Crookston suspiciously left JJMT right before the payments stopped flowing and right about when Chase Bank shut down their accounts. He sent the following text message in 2021 providing a different explanation for his departure to another investor about how his partners "looked at risk":

16



95.    Upon information and belief, when Crookston left JJMT he received in excess of

$4,000,000 severance and has held onto this money knowing that it was ill-gotten.

96.    Schweinzger did not warn Plaintiffs about how his colleague left the firm because

of how the remaining members "looked at risk" and instead continued to lull Plaintiffs into thinking

all was well and to continue investing in the Ponzi Scheme he was personally afraid of.

97.    Upon information and belief, at about the same time that Crookston left JJMT,

JJMT had to stop using J.P. Morgan Chase Bank due to suspected fraud and transferred all of its

accounts to First Republic Bank in California.

98.    Plainly, if the bank handling the transaction couldn't tolerate the numerous red

flags, nor should have Schweinzger.

99.     In late February 2021, Schweinzger informed Plaintiffs in an email that JJMT had retained new counsel at King & Spalding in Los Angeles to determine validity of 1inMM and to pursue litigation.

100.    Obviously, the time to determine the validity of 1inMM with the help of competent counsel was before selling nearly $400,000,000 in investment into it.

101.    On February 28, 2021, JJMT called several investors to tell them that **after just one day of investigating,** new counsel at King & Spalding discovered Horwitz's fraud and Ponzi Scheme.

102.    On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation.

103.    Plaintiffs justifiably relied on Schweinzger's representations about the suitability of investment in 1inMM because he and the JJMT principals had worked for blue chip private equity firms investigating investments at the very highest levels and Schweinzger was the CFO of Acrisure.

104.    Plaintiffs relied on Schweinzger to investigate the investment he was offering and confirm facts presented in the offering materials.

105.    Plaintiffs justifiably relied on Schweinzger's statements about the investment and that JJMT had a reasonable basis for recommending the investment.

**E.  Kiser's Investment in JJMT**

106.    Kiser was first sold on the 1inMM Offering in the fall of 2015 by Schweinzger.

107.    Kiser went on to make several investments with Schweinzger in JJMT in 2017 that were repaid as promised.

108.    On March 21, 2021, Kiser executed a promissory note as part of the 1inMM Offering agreeing to invest $200,000.

109.    To date, Kiser is owed over $250,000 from JJMT.

**F. Feine's Investment in JJMT**

110.    Fiene was first sold on the 1inMM Offering in the fall of 2015 by Schweinzger.

111.    Fiene went on to make several investments with Schweinzger in JJMT in 2018 that were repaid as promised.

112.    On June 27, 2019, Feine executed a promissory note as part of the 1inMM Offering agreeing to invest $70,000.

113.    On July 19, 2019, Feine executed a promissory note as part of the 1inMM Offering agreeing to invest $85,000.00.

114.    On August 21, 2019, Feine executed a promissory note as part of the 1inMM Offering agreeing to invest $40,000.

115.    To date, Feine is owed over $243,500 from JJMT.

## V.    CLAIMS

### COUNT I
### Breach of Fiduciary Duty

116.    Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 116.

117.    Schweinzger owed fiduciary duties to Plaintiffs including the duties of utmost loyalty, good faith, full and fair disclosures, and the duty to:

    a)    Provide investment advice that is in Plaintiffs' best interest;
    b)    Refrain from engaging in activities that conflict with Plaintiffs' interests;
    c)    Make full and frank disclosure of his conflicts of interest, to the extent such conflicts cannot be avoided; and
    d)    Investigate 1inMM fully prior to recommending any investment in it.

118.    Defendant breached the fiduciary duties he owed to the Plaintiffs by:

    a)    Negligently misrepresenting the nature of the investments;
    b)    Negligently misrepresenting the value of the investments;
    c)    Failing to investigate the investment as required of professionals recommending investments;
    d)    Concealing the fact that Chase Bank shut down JJMT's accounts because it exhibited red flags of a Ponzi scheme;
    e)    Concealing Horwitz's misrepresentations; and
    f)    Other breaches of fiduciary duties detailed herein.

119.    Defendant's breach of his fiduciary duties caused injuries to Plaintiffs.

120.    Defendant unjustly profited from his breaches of duty with a huge severance payment when he left JJMT.

121.    As a direct and proximate result of Defendant's breach, Plaintiffs has suffered damages, which consist of investment losses caused by Defendant's breach, recovery of monies paid to them and the entities under his control and lost interest.

122.    As a direct and proximate result of Defendant's breaches of fiduciary duty as detailed herein, Plaintiffs has been damaged in an amount to be proven at trial in excess of $500,000.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully request that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

## COUNT II
### Negligent Misrepresentation

123.    Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 123.

124.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Schweinzger are the rules promulgated by FINRA, which each broker offering securities such as the 1inMM notes should be a member of, and the CFA Institute Code of Ethics.

125.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

126.    Defendant owed Plaintiffs a duty to act as a reasonably prudent broker-dealer or CFA would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiffs as a result of the client relationship between Schweinzger and Plaintiff.

127.    As set forth above, Defendant breached his legal duty to provide accurate information to Plaintiffs as holder of investments in JJMT by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

128.    By reason of the aforesaid, Defendant is guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in 1inMM Offerings.

129.    At all times relevant to this action, Defendant had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Defendant made material omissions of fact with respect to the offer and sale of securities.

130.    As described above, Defendant negligently breached his duties to Plaintiffs.

131.    Had a reasonably prudent financial professional under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

132.    By approving of the sale of the 1inMM Offerings to his clients, notwithstanding the numerous red flags identified herein, Schweinzger demonstrated that he failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure he maximized his placement agent fees and commissions.

133.    Schweinzger further breached his duty when he left JJMT by failing to inform Plaintiffs of his fears of his partner's risk taking and instead recommended Plaintiffs continue investing in the scheme.

134.    Schweinzger knew or should have known that Plaintiffs would place his trust and confidence in him that he had a reasonable-basis to conclude that 1inMM was suitable for at least some investors, and that he had conducted adequate due diligence to understand the risks and rewards of the 1inMM offering, and that if he learned something that would give him cause to leave he would have shared these facts as required pursuant to applicable standards.

135.   Schweinzger knew or should have known that it was reasonably foreseeable that Plaintiffs would act in reliance on his and JJMT's approval to sell the 1inMM Offerings.

136.   But for Schweinzger's approval to sell the 1inMM Offerings, Plaintiffs would not have even been presented the opportunity to participate in the 1inMM Offerings.

137.   As a direct and proximate result of Schweinzger's negligence, 1inMM is liable to Plaintiffs for all of the investment losses that they suffered in 1inMM.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully request that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

### COUNT III
### Unjust Enrichment

138.   Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 138.

139.   Schweinzger received and retained a benefit from Plaintiffs and inequity has resulted.

140.   Schweinzger benefitted from negligently misrepresenting the nature and value of the Plaintiffs investment and Horwitz's gross fraud.

141.   Schweinzger directly benefitted by earning over millions as a result of Horwitz's admitted criminal conduct.

142.   Plaintiffs conferred a benefit on Schweinzger by paying excessive interest on fraudulent investments.

143.   It is inequitable for Schweinzger to retain these benefits.

144.     Plaintiffs was not aware of the true facts about the investment, and did not benefit from Schweinzger's conduct.

145.     Schweinzger knowingly accepted the benefits of his unjust conduct and refused to return the benefit when the fraud was admitted.

146.     As a result of Defendant's conduct, the amount of his unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully request that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

<u>**COUNT IV**</u>
**Violation of California Corporations Code Section 25401 -**
**Untrue Statements or Omissions in Connection with Sale of Security**

147.     Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 132.

148.     Schweinzger directed emails to California to solicit investment from Plaintiffs there, visited California to discuss JJMT investments with them, and received funds wired by Plaintiffs from California.

149.     California Corporations Code Section 25401 reads as follows:

"It is unlawful for any person to offer to sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

150.     By its terms, Corporations Code Section 25401 does not require any fraudulent misrepresentation or and intent to deceive, rather simply the making of untrue statements of material fact or the non-disclosure of a material fact.

151.     As more fully set forth above Plaintiffs allege that the above-described representations, promises, assurances, expressions of opinion and non-disclosures of material fact by defendants were made negligently, recklessly, and carelessly.

152.     California Corporations Code Section 25501 is the remedial statute for Code 23 Section 25401, and reads as follows:

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells security to him, who may sue either for rescission or damages.

138.     Schweinzger is jointly and severally liable pursuant to California Corporations Code Section 25504 which provides in pertinent part:

> Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker–dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

153.     Schweinzger offered to sell Plaintiffs securities within the State of California, by means of both oral and written communications by Schweinzger to Plaintiffs, and said offer included untrue statements concerning the true value of the units being offered, and numerous statements lulling Plaintiffs to allow the fraud to continue, whereas the true facts were that 1inMM was a complete scam with no actual value at all and was a pure Ponzi Scheme.

154.     Plaintiffs are therefore informed and believe and based thereon allege that Schweinzger made untrue and misleading statements of material facts and also omitted material facts in offering and selling the 1inMM Offering to Plaintiffs.

155.     Plaintiffs is informed and believes and based thereon allege that defendants Schweinzger should reasonably have known these statements were untrue and misleading at the time they made them, and that plaintiffs were in complete reliance upon his claimed superior and exc1usive knowledge, information and expertise, and that the facts stated and omitted were material to Plaintiffs' decision to participate in the 1inMM Offering

156.     As a result of Schweinzger's representations and non-disclosures, Plaintiffs participated in the 1inMM Offering and caused investment funds to be transferred to funds operated by defendants to purchase the subject securities.

157.     For all the reasons set forth above the Plaintiffs lost the entirety of their investment and hereby seek recovery of the full amount of their monetary detriment, damage and loss in the sum in excess of $500,000 or in an amount or amounts to be established according to proof at time of trial.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully request that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

## <u>COUNT V</u>
### Violation of California Corporations Code Section 25501.5
### Untrue Statements or Omissions in Connection with Sale of Security

158.    Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 158.

159.    Schweinzger was acting on behalf of JJMT when selling their securities with the various entities knowledge and approval.

160.    The promissory notes at issues here sold to were securities.

161.    When Plaintiffs purchased the promissory notes Defendants were required to be licensed as a securities broker-dealer, or to have applied for and secured a certificate under California Corporations Code section 25200.

162.    Schweinzger is not licensed as a securities broker-dealer in California, nor, upon information and belief have they applied for and secured a certificate under California Corporations Code section 25200, Part 3.

163.    As a proximate result of Schweinzger's and the JJMT's failure to obtain the proper broker-dealer licensing or certificate, Plaintiffs are entitled to rescission of the investments in JJMT and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully requests that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

## COUNT VI
## (VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

164.    Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein as paragraph 164.

165.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Schweinzger engaged in conduct that violated each of this statute's three prongs.

166.    Schweinzger committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., when it violated the CLRA as alleged above.

167.    Schweinzger committed unfair and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively misrepresented, actively concealed, and/or failed to disclose the following:

a.    Schweinzger misrepresented the nature the 1inMM Offering to Plaintiffs, including providing absolutely no risk disclosures whatsoever;

b.    Schweinzger concealed the fact that their accounts at Chase Bank were shut down due to suspected fraudulent activity;

c.    Schweinzger failed to inform Plaintiff that it failed did the most basic investigation of the investment and that one of its members left because he questioned how risky the investment was.

d.    Schweinzger failed to disclose to Plaintiff that 1inMM had no accountant and was never audited.

e.    Schweinzger failed to disclose that they never initiated any direct communication with anyone at Netflix or HBO.

f.    Schweinzger also failed to disclose to Plaintiff that 1inMM was a speculative business that lacked any internal controls necessary to prevent the misuse and misappropriation of their money.

168.    These were all material facts that were required to be fully disclosed to the Plaintiff and the Class that JJMT actually knew despite their ostrich defense employed here.

169.    Schweinzger's unfair or deceptive acts or practices occurred repeatedly in the course of Schweinzger's trade or business, and were capable of deceiving a substantial portion of its membership.

170.    As a direct and proximate result of Schweinzger's unfair and deceptive practices, Plaintiffs have suffered and will continue to suffer actual damages.

171.    As a result of its unfair and deceptive conduct, Schweinzger has been unjustly enriched and should be required to make restitution to Plaintiffs pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

WHEREFORE, Plaintiffs CHRISTIAN FIENE and ERIK KISER, respectfully request that this Court enter judgment in their favor and against Defendant, MATTHEW SCHWEINZGER, in an amount in excess of $500,00 as well as any and all further relief that this Court deems necessary and appropriate under the circumstances.

Respectfully Submitted,
**CHRISTIAN FIENE and ERIK KISER**
Plaintiffs

By:

One of Plaintiffs' Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: 312.899.6625
c: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandesienberg.com

Firm No: 64600

Dated: October 27, 2021